

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GROVER SELLERS
ATTORNEY GENERAL

Honorable George H. Sheppard
Comptroller of Public Accounts
Austin 11, Texas

This Opinion
Overrules Opinion
# O-3817

Dear Sir:

Opinion No. 0-6128

Re: Consideration of three ques-
tions concerning the recycling
provision of Article 7047b,
V.A.C.S.

This Department has most carefully considered your re-
quest for opinion concerning the recycling provision of Article
7047b, which provides;

". . . provided that notwithstanding any other pro-
vision herein to the contrary, where gas is processed
for its liquid hydrocarbon content and the residue
gas is returned by recycling methods to the same gas-
producing formation underlying the land from which
the gas is produced, the taxable value of such gas
shall be three fifths (3/5) of the gross value of
all products extracted, separated and saved from
such gas. * * *"

Your first question is:

## I

Where the same person or concern is both producer of
gas and operator of a recycling plant, will the tax accrue on
3/5 of the gross value of all products, based upon the value
of refined products, such as aviation gasoline, solvents, etc.,
extracted, separated and saved?

It should be noted at the outset that the tax levied
by Article 7047b is a severance tax. This statute contains the
following language; "There is hereby levied an occupation tax
on the business or occupation of producing gas within this State.
...A tax shall be paid by each producer on the amount of gas
produced . . . equivalent to 5.2 per cent of the market value...
as and when produced." (Emphasis ours)

COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Honorable George H. Sheppard, page 2


The recycling provision of the statute merely provides the method of determining the market value of the original gas as produced. Davis, Inc. v. State, 180 S.W. (2d) 429, 433. Only the producer thereof is taxed, not the refiner.

In order to understand properly the intention of the Legislature in enacting this statute, it is necessary to look into the history of cycling plants. The original gas tax statute was passed in 1931, and neither it nor the amendment of 1936 contained any special provision applying to cycling plants. It was not until the amendment of 1941 that the recycling provision was added. (The words "cycling" and "recycling" are used herein as defined in Opinion No. 0-5868.)

The first recycling plants were constructed and put into operation in 1938. These first plants produced condensate or distillate, raw unfinished products, which were marketed to refiners.

Plant operators in time found that they could manufacture finished products, and that the additional investment and operating expense necessary for the manufacture of these products were justified by the increase in their market value. This was the start of the general trend of cycling plants to produce finished products. Because of the war, almost all cycling plants have been revamped to permit the manufacture of a variety of products.

The cycling plant operation consists of scrubbing incoming rich vapors with absorption oil at pressures ranging up to 2,000 pounds per square inch. The processed dry gas is then compressed and returned to the formation, while the absorption oil containing the recovered heavier hydrocarbons is stripped of its content in one or a series of stills. The recovered condensate is then processed or refined by modern methods of distillation and fractionation into such products as mineral oil, kerosene and gasoline, and into butane, propane and ethane fractions.

Cycling plants can function either independently or in complete or partial integration with refinery operations. A cycling plant operating independently of refinery operations does no more than extract the liquefiable hydrocarbons, which are then delivered to a refinery for further treatment.

In cycling plants partially integrated with refinery operations, the propane-ethane fraction may be returned to the reservoir, and the mixed butane fraction is delivered to a refinery. The heavier products, however, are refined in refinery

Honorable George H. Sheppard, page 3

equipment added to the cycling unit, to yield a number of finished products.

Cycling plants completely integrated with refinery operations return the ethane-propane mixture to the formation as before, while the butane fraction undergoes separation, in expensive refinery equipment added to the cycling unit, into normal butane and isobutane. The heavier fraction is further refined into a variety of finished products. (See J. M. Flaitz, Oil & Gas Journal, April 20, 1944; Ducker and Dotterweich, Oil & Gas Journal, May 11, 1944; James E. Pew, The Oil Weekly, December 6, 1943.)

There are 300,000 or more possible chemical compounds which may conceivably be made from the hydrocarbons in gas. (Oil & Gas Journal, January 21, 1943.) As Dr. Gustav Egloff, the foremost hydrocarbon protagonist, said:

"If we start with methane gas alone, all of the known synthetic products that man has produced in organic chemistry can be derived. . ."

It will be noted that in all types of cycling plants above mentioned, the initial operation is the recovery of the liquefiable hydrocarbons, called condensate or distillate. The recovered condensate is further processed by distillation and fractionation (refining operations) into the final finished products. At the time of the passage of the amendment to Article 7047b in 1941, there was not a plant in operation which turned out anything other than condensate, and a few then more advanced plants which obtained a partial recovery of the butane fraction. The integrated cycling plants now in operation over the State yeild such a variety of products, ranging from condensate to the highly refined products mentioned above, with all stages of partial refining in between, that it is not reasonably to be inferred that the Legislature intended to base the tax upon the value of the end or refined product.

A similar question has arisen in several jurisdictions, including Texas, in regard to whether the producer, who operates a well, should pay royalty owners on the basis of the market value of gas as gas, or on the basis of certain products which he manufactured from the gas. A recent Texas case is Danciger Oil & Refineries, Inc. v. Hammill Drilling Co., et al., 171 S.W. (2d) 321, by the Supreme Court. In that case Hammill assigned to Danciger a working interest in the lease in question, reserving to itself an overriding royalty as follows: "Said Assignor hereby retains as part of the consideration for this assignment and shall be entitled to receive one twenty fourth (1/24th) of all the oil, gas, casinghead gas, and other minerals produced, saved and marketed at the prevailing price paid by major companies . . .

Honorable George H. Sheppard, page 4

from the properties above described free and clear of operating expenses if, as and when produced, saved and marketed. . ."

At the time of the assignment it was known that the wells which had been drilled produced only sweet gas, and that there was no market in the vicinity at that time for sweet gas. Danciger erected an expensive plant on the leased premises for the purpose of separating the gas into its component parts. The gas was run through the plant, where it was separated at considerable expense into these components: gasoline, gas-oil, distillate, kerosene, butane, propane, and residue gas. Hammill sued Danciger for an accounting, contending that it was entitled to be paid 1/24th of the gross receipts of all products manufactured from the gas produced on the premises. The court held that under the contract Hammill was not entitled to have the gas refined into some other commodity, but was bound to accept payments out of the gas as it was then being produced from the wells. At page 323 the Court said:

"If Danciger was not required by the contract to refine the oil so produced, by what provision thereof is it required to refine any of the other products named therein? Moreover, if some of the products are to be refined, to what fineness are they to be refined?"

In view of the various degrees of integration of cycling plants with refineries, as pointed out above, this last query by the Supreme Court is most pertinent in the consideration of the questions presented by your request.

At this point we wish to call your attention to Article 7057a, which levies an occupation tax on oil produced and which is, in many respects, analogous to Article 7047b. That statute levies a tax of "4.125 per cent of the market value of said oil". It has never been contended that the market value therein referred to included the value of the finished products refined from said oil.

In the case of Davis, Inc. v. State, 180 S.W. (2d) 429, the contention was made that if Article 7047b is construed as levying an occupation tax on the occupation of refining liquids from gas, it is violative of Section 35 of Article III of the State Constitution, which provides:

"No bill * * * shall contain more than one subject, which shall be expressed in its title, * * *"

Of this the court said:

Honorable George H. Sheppard, page 5

"We think the Act is not subject to this objection, because the occupation of refining liquids from gas is not therein taxed. It is true that the Act provides that 'where gas is processed for its liquid hydrocarbon content and the residue gas is returned by recycling methods to the same gas-producing formation underlying the land from which the gas is produced, the taxable value of such gas shall be three fifths of the gross value of all (the) products extracted, separated and saved from such gas,' but such quoted provision merely provides the method of ascertaining the value of the original gas, and the producer thereof only is taxed, not the refiner." (Emphasis ours)

There is a final consideration which we wish to advance. Section 1 of Article VIII of the Constitution of the State of Texas provides that all taxes shall be "equal and uniform". Section 2 of said Article VIII provides that "all occupation taxes shall be equal and uniform upon the same class of subjects. ..." Therefore, it is the duty of the courts to place a construction on a taxing statute that will make the tax equal and uniform upon all subjects of the same class. It is obvious that all operators of cycling plants who are also producers of gas are of the same class, and it is equally obvious that making the processor, who is also a refiner, pay a tax based upon the value of the refined products, and permitting the simple processor to pay a tax based on the value of the unrefined condensate would result in harsh inequalities and complete lack of uniformity. Even if open to two such constructions, that which gives the statute validity, rather than the one which strikes it down, should be applied. City of Waco v. Landingham, 138 Tex. 156, 157 S.W. (2d) 631; Western Co. et al., v. Sheppard, 181 S.W. (2d) 850.

In answer to your first question, therefore, you are advised that it is the opinion of this department that in the situation there presented, the tax should be based upon the market value of 3/5ths of the condensate or distillate extracted, separated and saved from such gas, and not upon the market value of the refined, finished product.

Your second question is:

II

Where the producer and the operator of the recycling plant are not the same, how will the value of the gas be measured in computing the tax?

It is indeed strange that, in the thirteen years Texas has had a gas tax statute, only one case concerning it has reached the appellate courts. It is even more strange when you consider the statute, which certainly is no model of clarity or certainty. Consequently, it is most unfortunate that when this case reached the Supreme Court the issues were not so drawn that the Court could clarify the intent of the statute.

We speak of the case of W. R. Davis, Inc. v. State, 180 S.W. (2d) 429. There the producers contracted with Davis to process the gas produced, and to return the residue to the formation from which it had been taken, and in return gave Davis one-half of the gas products or distillate derived from such gas, and retaining the other one-half of the products.

Davis then made a contract with the producers, whereby he purchased from them all of their one-half interest in the condensate or distillate extracted from the gas. Under this contract, Davis paid the producers $1.36 per barrel for their product during May, 1941, and $1.44 for the remaining time involved in the suit. Taxes were paid on 3/5 of all of the condensate recovered from the gas, computed at the value the same as the price paid by Davis to the producers, i.e., at $1.36 and $1.44 per barrel.

After purchasing the condensate, Davis transported it to Corpus Christi, where he sold it at prices ranging from $1.90 to $2.25 per barrel. The State sued Davis for taxes computed at the price received by him at Corpus Christi, less the cost of transportation.

The Supreme Court denied the State any recovery, saying that the sale in the field established a standard of value for the condensate. At page 432 appears this language:

"Of course, the statute contemplates that the purchase contract between the purchaser and the producer shall be a good faith agreement and free from fraud and collusion as regards the State's claim for the taxes under this Act. When we view this Act as a whole, and especially when we consider the definition of 'market value' therein contained, we are convinced that it demonstrates a clear legislative intention to make the good faith sale price by the producer to the initial purchaser the standard of value on which the purchaser's liability to the State for taxes must be computed." (Emphasis ours)

Honorable George H. Sheppard, page 7

In arriving at this conclusion, the Court further considered the portion of this statute requiring the purchaser to deduct the taxes from the purchase price. The Court said:

"The purchaser collects the tax from the producer by deducting the amount thereof from the amount of the purchase price. . . A reading of the part of this statute last above mentioned would certainly make the purchaser liable to the State for the tax levied by this Act against the producer, computed on the value as represented by the price paid to the producer therefor. Certainly this portion of the Act does not contemplate that the purchaser shall pay the producer one price, deduct the tax due the State at that price, keep the tax at that price segregated, and then pay the State a tax at another price." (Emphasis ours)

Therefore, the contract between the producer and the operator of the cycling plant (assuming it to be a bona fide sale made "at arm's length") will set the unit value of the product on which the tax is to be based. This is in conflict with the answer to Question VI of Opinion No. O-3817, and overrules that portion of said opinion.

Your third question is:

## III

Where the concern is both producer and operator of the recycling plant, and it is found that such concern has failed to remit the proper tax, may the audit fee as provided in Section 5 of Article 7047b be charged?

Section 5 of Article 7047b provides in part:

"...if any producer of gas shall fail to remit the proper taxes, penalties, and interest due, or any of them, the Comptroller may employ auditors or other persons to ascertain the correct amount due, and the producer of gas shall be liable, as an additional penalty, for the reasonable expenses or the reasonable value of such services of representatives of the Comptroller, incurred in such investigation and audit;..." (Emphasis ours)

Honorable George H. Sheppard, page 8

The wording of the statute is clear. As a producer, the person or concern inquired about in your third question is liable for the audit fee.

Trusting that this fully answers your inquiries, we are,

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By *Arthur L. Moller*
Arthur L. Moller
Assistant

SEP 27 1934

ATTORNEY GENERAL OF TEXAS

ALM/JCP


APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN